# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# LAFAYETTE-OPELOUSAS DIVISION

| | | |
|---|---|---|
| SYLVIA A. FONTENOT | * | CIVIL ACTION NO. 08-cv-0820 |
| VERSUS | * | JUDGE REBECCA F. DOHERTY |
| COMMISSIONER OF SOCIAL SECURITY | * | MAGISTRATE JUDGE HILL |

## *REPORT AND RECOMMENDATION*

Before the court is an appeal of the Commissioner's finding of non-disability.

Considering the administrative record, the briefs of the parties, and the applicable law, it

is recommended that the Commissioner's decision be **AFFIRMED**.

### *Background and Procedural History*

The claimant, Sylvia A. Fontenot ("Fontenot"), now 56 years old, filed a claim for

disability insurance benefits on September 16, 2003, on the basis that she had been

disabled since January 31, 2003, due to back problems.[1]  She has a high school education

and past work experience as a nursing home housekeeper, kitchen helper, and school

cook.  Her claim was denied initially, and she filed a timely written request for hearing.

On January 21, 2005, a hearing was held before the Administrative Law Judge

(hereinafter "ALJ").  (Tr. 187-211).   In his decision dated February 18, 2005, the ALJ

determined that claimant was not disabled.  (Tr. 12-20).

---

[1]Fontenot was insured for disability benefits through September 30, 2003.  (Tr. 13).  Thus, she must establish disability on or prior to this date.

The Appeals Council denied review on March 25, 2005, and claimant timely filed her first appeal, alleging that the ALJ erred in determining credibility, and that the ALJ's decision was not supported by substantial evidence.

In her first appeal, Fontenot asserted that her treating physician's final opinion regarding her inability to work should be controlling in this case. After Fontenot's unsuccessful attempt to return to her job as a cafeteria worker, Dr. Nason gave his opinion that claimant was not able to tolerate return to work at all. However, Dr. Nason did not indicate whether he was restricting his opinion to her job as a cafeteria worker, or if he was referring to all types of work. The ALJ assumed, without seeking further clarification, that Dr. Nason's opinion was limited to Fontenot's job as a cafeteria worker.

Therefore, because the undersigned found that the ALJ erred in assessing Fontenot's residual functional capacity, this Court reversed and remanded the case for a determination by Dr. Nason or another orthopedic specialist as to Fontenot's residual functional capacity on or before September 30, 2003, which was the date through which she was insured for disability benefits.[2] Fontenot then submitted new evidence, including a letter from Dr. Nason dated August 8, 2005, which referenced treatment by Dr. A. John Tassin, Jr. at Charity Hospital. (Tr. 256). However, there are no records from Dr. Tassin or Charity Hospital in the transcript.

---

[2] *See* Judgment rendered by the undersigned on February 13, 2006. (Tr. 215-225).

Upon remand, the ALJ again concluded that claimant was not under a disability within the meaning of the Social Security Act from January 31, 2003, through the date last insured which was September 30, 2003. (Tr. 171). Claimant again appealed the ALJ's decision, and her case is now before this Court for review a second time.

### *Standard of Review*

The court's review is restricted under 42 U.S.C. § 405(g) to two inquiries: (1) whether the Commissioner's decision is supported by substantial evidence in the record; and (2) whether the decision comports with the relevant legal standards. *Carey v. Apfel*, 230 F.3d 131, 136 (5th Cir. 2000); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). Where the Commissioner's decision is supported by substantial evidence, the findings therein are conclusive and must be affirmed. *Richardson v. Perales*, 402 U.S. 389, 390, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). The Commissioner's decision is not supported by substantial evidence when the decision is reached by applying the improper legal standards. *Singletary v. Bowen*, 798 F.2d 818 (5th Cir.1986).[3] While substantial evidence lies somewhere between a scintilla and a preponderance, substantial evidence clearly requires "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Muse*

---

[3] Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Carey*, 230 F.3d at 136; *Anthony*, 954 F.2d at 292; *Carrier v. Sullivan*, 944 F.2d 243, 245 (5th Cir. 1991). The court may not re-weigh the evidence in the record, nor substitute its judgment for that of the Commissioner, even if the preponderance of the evidence does not support the Commissioner's conclusion. *Carey*, 230 F.3d at 136; *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the decision. *Johnson*, 864 F.2d at 343.

*v. Sullivan*, 925 F.2d 785, 789 (5th Cir.1991).

## *Analysis of Impairments*

To be entitled to benefits under the Social Security Act, claimant must prove that she is disabled according to the specifications of the Act. *Leggett v. Chater*, 67 F.3d 558, 563-64 (5th Cir. 1995); *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically-determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a); *Anthony v. Sullivan*, 954 F.2d at 292.

In determining whether a claimant is capable of performing substantial gainful activity, the Secretary uses a five-step sequential procedure set forth in 20 C.F.R. § 404.1520(b)-(f) (1992).[4] At step two, the ALJ determined that claimant had the following severe combination of impairments: degenerative disc disease of the lumbar spine and carpal tunnel syndrome.[5] (Tr. 173). At step three, the ALJ found that the claimant's

---

[4] The procedure is as follows:
1. If a person is engaged in substantial gainful activity, he will not be found disabled regardless of medical findings.
2. A person who does not have a "severe impairment" will not be found to be disabled.
3. A person who meets the criteria in the list of impairments in Appendix 1 of the regulations will be considered disabled without consideration of vocational factors.
4. If a person can still perform his past work, he is not disabled.
5. If a person's impairment prevents him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed.

[5] *See* 20 C.F.R. § 404.1520©.

4

combination of impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpt. P, Appendix 1.

The ALJ found that claimant had the residual functional capacity to lift and carry ten pounds frequently and twenty pounds occasionally, stand, walk, and sit one and a half (1½) hours at a time, up to six hours in a workday, with the ability to push and pull limited by the weight she was able to lift and carry. (Tr. 174). He further found that claimant was able to perform no over-the-shoulder work with the left arm and was able to perform frequent, but not continuous, tasks of fine fingering. Therefore, at step four, the ALJ found that claimant was able to return to her past relevant work as a housekeeper because that job did not require the performance of activities which would be precluded by the claimant's residual functional capacity.[6] (Tr.177). Accordingly, the ALJ determined that claimant was not disabled and denied benefits.

### Assignment of Errors

Claimant alleges the following errors:[7]

I.      The ALJ failed, as ordered on remand, to obtain a proper functional capacity assessment, or to accept the testimony of the claimant and the prior and subsequent reports of her treating orthopedist evidencing claimant's inability to work whatsoever;

II.     The ALJ failed, as ordered on remand, to consider the side effects of the medications appropriately prescribed to claimant; and

---

[6] *See* 20 C.F.R. § 404.1565.

[7] *See* claimant's brief. [rec. doc. 9, p.2].

**III.**    The ALJ's statement of impairments is without substantial factual basis, ignores the findings of the treating physician, and are based solely on the "totally unreliable and without basis testimony of a doctor retired for seventeen (17) years."

*Administrative Record*

**I.    Medical Evidence**

**A.  Dr. Stephen Nason, orthopedic surgeon**

Dr. Nason treated Fontenot for low back and posterior hip pain from February 1, 2002 through at least September, 2008.  In 2002, she was working as a high school cafeteria worker.  Upon examination on February 1, 2002, she had some tenderness in the posterior iliac crest area and pain which radiated across the iliac crest into the groin area. (Tr. 131).  Pelvic x-rays revealed some mild narrowing and increased sclerosis at the lower portion of the right SI joint.  Dr. Nason's impression was chronic sacrioilitis, for which he prescribed Medrol.  On February 22, 2002, claimant reported that she was "doing considerably better" and had only "a little tinge of pain" and only with certain movements.  (Tr. 130).  Mobic was prescribed.

On January 17, 2003, claimant's MRI showed a transitional level at the lumbosacral junction but no significant abnormalities.  (Tr. 129).  On January 31, 2003, Fontenot was continuing to have significant back problems.  The Medrol was helping some, but not a great deal.  Fontenot advised Dr. Nason that she had taken a leave of absence from her job because of problems "doing her fair share" at work.  (Tr. 128).

On February 28, 2003, Fontenot reported left shoulder pain and some swelling in the arm, which radiated almost to the wrist at times. She was taking Bextra, which helped some. Dr. Nason prescribed Flexeril to help with nighttime pain. (Tr. 127).

In May, 2003, Fontenot continued to have intermittent hip pain, particularly when standing too long or doing too much on her feet. (Tr. 125). She also noted some grinding in her left knee, which had some marked crepitation on examination. Additionally, she had some left arm pain, which Dr. Nason injected at the trigger point. No other medicines were prescribed.

On July 9, 2003, Fontenot reported that she wanted to go back to work, but she was not sure whether she would be able to tolerate it. (Tr. 124). Dr. Nason thought that it was okay for her to try, but he stated that "I frankly would be very surprised if she is going to be able to tolerate it though. I think with her problems she is going to be very limited in what she is able to do." Bextra was prescribed.

On August 8, 2003, Fontenot reported that she had tried to go back to work, but she could only work for one hour on the second day because of lifting. (Tr. 123). Dr. Nason stated that "it is evident that she is not going to be able to tolerate return to work at all," which he advised her not to do. He gave her an injection in the right SI joint. No other medications were prescribed.

On September 15, 2003, claimant reported having some back soreness but said that overall she was doing "ok." (Tr. 121). The Medrol seemed to have helped, and Mobic

was prescribed.  In November, 2003, claimant required another SI joint injection.  (Tr. 120).  In January of 2004, Dr. Nason noted that claimant was experiencing a bit of agitation and depression from her continued symptoms of intermittent neck and arm pain.  (Tr. 119).  He prescribed Elavil and Flexeril 5mg to be taken at night.

On March 11, 2004, Dr. Nason injected claimant in a trigger point over the scapula.  (Tr. 118).  She continued to complain of sacroiliac pain, as well as intermittent left knee problems.  Claimant presented with similar symptoms in June and September of 2004.  (Tr. 117, 134).  She received several additional trigger point injections, and no other medications were prescribed.

On December 17, 2004, claimant reported that she was doing "pretty much the same overall".  (Tr. 133).  She was hurting on and off during the day, with more problems at night.  She reported that the muscle relaxer, Flexeril, helped more than anything.  She reported that was still taking the pain medication and Bextra.  Dr. Nason noted that the last injection did not seem to help for more than two to three weeks.  He stated that he would continue with her symptomatic treatment.

On August 8, 2005, claimant presented to Dr. Nason with tenderness along the trapezius on both sides and tension headaches.  (Tr. 256).  No medical tests were done. She indicated that she had been seen by Dr. Tassin at Charity and that he had prescribed Indocin 50 mg and Zoloft for anxiety.  Dr. Tassin's records are nowhere in the case transcript.

Dr. Nason stated in an evaluation dated March 2, 2006, that, in his opinion, claimant "is unable to return to any work whatsoever." (Tr. 258). He concluded by saying that he would "certainly encourage her application for social security to go forward." On December 13, 2006, claimant presented with complaints of left arm and shoulder pain. (Tr. 257). Dr. Nason gave claimant another IM Celestone injection and refilled her current medications, which included Ultram and Robaxin.

On April 23, 2007, claimant presented with complaints of recurrent right sacroiliac pain and left scapula trigger point pain. (Tr. 255). Claimant also complained of left knee swelling. Dr. Nason found that claimant was markedly tender over her right SI joint, and he gave injections of Depo-Medrol 40mg, Xylocaine 3cc, and Celestone. On July 20, 2007, claimant presented with multiple joint symptoms and left arm swelling with some numbness and tingling in her right hand. (Tr. 254). Claimant reported that she had been walking thirty minutes a day but sometimes had to break it into two (2) fifteen minute sessions instead because of her pain. He re-injected with Depo-Medrol 40mg, Xylocaine 3cc, and Celestone.

On October 10, 2007, Dr. Nason wrote a note excusing the claimant from jury duty due to her sacroilitis and arthritis of the cervical spine. (Tr. 269). He wrote that she was unable to sit or stand for prolonged periods of time. In his evaluation on December 6, 2007, Dr. Nason stated that claimant "is an excellent candidate for SSI benefits." (Tr. 268). Dr. Nason did not reference any objective findings or medical tests to support his

opinion that claimant was unable to return to work.

On May 7, 2008, claimant presented with complaints of pain and tingling in her foot, toes, and left hand. (rec. doc. 5). Her most severe complaint was a pressure point in her left shoulder. He injected her trigger point at the right SI joint. Claimant continued to take Mobic. Dr. Nason's evaluation describes Fontenot's condition as "hurting everywhere."

On September 12, 2008, claimant complained of increased symptoms of neck pain, left knee and hip pain, and left arm and shoulder pain. (rec. doc. 10). Dr. Nason noted that some of the increased symptoms could have been related to recent weather changes. He injected her left scapula trigger point with Medrol and Xylocaine. His progress notes indicate that claimant reported that she was still going to Charity and was taking Lortab and Soma.[8]

## B.  Dr. Elemer Raffai, orthopedic surgeon

On December 18, 2002, Fontenot saw Dr. Raffai for right hip and low back pain. (Tr. 97-8). On cervical spine examination, she had no muscle spasms, point tenderness or guarding. She had no signs of upper extremity weakness, atrophy, or loss of sensation. Reflexes were normal. In the lumbar spine, she had tenderness at L5-S1, stiffness, and muscle spasms. Dr. Raffai's impression was right hip bursitis and low back pain. He administered a trigger point injection, prescribed Vioxx and Keto Cam Gel, and

---

[8] There are no medical records from Charity Hospital or Dr. Tassin in the case transcript.

recommended an MRI. He also prescribed Bextra. (Tr. 104).

At the followup examination on January 3, 2003, Fontenot still complained of pain in the lower back. (Tr. 95). Physical examination revealed point tenderness at L5-S1 with stiffness. The MRI showed disc bulging at L5-S1 and spinal stenosis, which was causing some pressure on the S1 nerve roots and thecal sac. (Tr. 93). Dr. Raffai's diagnosis was lumbar enthesopathy. He recommended a steroid epidural injection. (Tr. 94).

## C. Residual Functional Capacity ("RFC") Assessment

In the Residual Functional Capacity Assessment dated October 20, 2003, the examiner determined that claimant could lift/carry 20 pounds occasionally and 10 pounds frequently; stand, walk and sit about 6 hours in an 8-hour workday, and had unlimited push/pull ability. She was able to perform all postural activities occasionally, except that she could never climb ladders, ropes, or scaffolds. The examiner noted that Fontenot should be able to do light work.[9]

## D. LSU Health Sciences Center

On March 23, 2007, claimant presented with back and neck pain at the emergency room. (Tr. 260). She reported that she was currently taking Ultram 50 mg, Zoloft 50

_____

[9] The regulations define "light work" as the following:

"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 C.F.R. § 404.1567(b).

mg, and Soma 350 mg, but she stated that she had been out of her medicines for a week.

The physician notes indicate that her back problem is chronic and the severity is mild.

(Tr. 262). Dr. Juan Soliven diagnosed fibromyalgia.[10] He prescribed Ultram (50 mg)

with refills, and also Ambien (10 mg) and Soma (350 mg) with no refills. (Tr. 263).

## II.    Testimonial Evidence: ALJ hearing

### A.  Dr. George W. Weilepp, independent medical expert

At the hearing on February 6, 2008, Dr. Weilepp reviewed claimant's medical

records and determined, based on her 2002 MRI and her treatment for carpal tunnel

syndrome, that claimant would have some restrictions of her activities such as: minimally

reduced sitting and standing (six hours or more and an hour and a half at a time), no

working with dangerous equipment, no working at any heights or in a heavy industrial

setting, no occupational driving, no fine fingering of continuous or highly repetitive

nature, no frequent kneeling, crawling, or squatting. (Tr. 275-6). He indicated that

occasional and also frequent fine fingering would be acceptable; for example,

keyboarding and computer work. (Tr. 276). Dr. Weilepp noted that most of the evidence

in the medical records consisted of claimant's subjective reports of pain. He found no

medical evidence in the record which indicated that claimant's condition had worsened

after September 30, 2003.[11]

---

[10] Chronic condition which causes pain.  (Tr. 265).

[11] Date last insured.

Upon questioning by claimant's counsel, Dr. Weilepp stated that he did not give any significant weight to the progress notes of Dr. Nason because the evidence was "subjective commentary" without any objective findings. (Tr. 277-8). He further stated that claimant's problems did not appear to be major or ongoing. (Tr. 278). He disagreed with Dr. Nason's finding that the claimant could not return to work based on the lack of objective medical evidence in the record which would support the claim. (Tr. 279, 282).

### B.  Sylvia Fontenot, claimant

At the hearing, Fontenot was 55 years old. (Tr. 285). She testified that she was 5 feet tall and weighed about 145 pounds, and that her weight had gone up over the previous few years. She stated that she had a GED. (Tr. 287).

Regarding employment, Fontenot reported that she had worked as a housekeeper in a nursing home for 10 years. She had also worked at a high school as a kitchen helper. She stated that she had stopped working because of back and leg pain. (Tr. 288). Additionally, she reported left shoulder and arm pain. She also had begun to experience leg, knee and hip pain with some swelling recently. (Tr. 293). Surgery has not been indicated for any of her problems, nor has physical therapy ever been recommended by her physicians. (Tr. 289). Her doctor recommended stretching exercises, which gave her temporarily relief.

Fontenot testified that she had been taking Lortab every day for the past several months. She testified that she started taking Lortab while she was still working but would

only take it when she got off work.[12]  She stated that she tried not to take the pain

medication because she does not want to become addicted.  (Tr. 294).  She has good days

and bad days.

Regarding activities, Fontenot testified that she walked, washed dishes, did

laundry, cooked, did a little light gardening, grocery shopped and attended church.  (Tr.

290-1).  Additionally, she drives to visit her mom once a week locally.  She visits with her

son often, and with her daughter every other week.  She drives to her daughter's home in

Texas occasionally but states that the trip is really hard on her back.  (Tr. 292).

She reported that she had to lie down and rest just about every day if she had had a

bad night with the pain.  (Tr. 290, 295).  As to restrictions, Fontenot reported that she had

to cut back on her walking and lifting over the past four or five months due to her back

pain.  (Tr. 292).  Now she walks about 15 minutes in the morning and 15 minutes in the

afternoon.  She also testified that, on some days, her husband has to help her with the

laundry.  (Tr. 293).

### C.  Beverly K. Majors, Ph.D, independent vocational expert

Beverly Majors testified as a vocational expert at the hearing.  (Tr. 295-99).   She

classified Fontenot's past work as a school cafeteria cook as light to medium and

semiskilled, and a housekeeper as light and unskilled.  The ALJ posed a hypothetical in

which he asked Dr. Majors to assume a claimant of the same age, education, and work

---

[12] There is no evidence of any prescriptions for Lortab in the record.

experience; who could lift and carry 20 pounds occasionally and 10 pounds frequently; could stand and walk and sit about six hours, about an hour and a half continuously, in an eight-hour day, could do no overhead work with the left arm, and could do frequent but not repetitive fingering. In response, Dr. Majors testified that claimant could do the jobs which she had previously done, namely, food service work and home housekeeper. When the ALJ asked whether claimant could do any of these jobs if she had to lie down during a workday for one hour at a time, Dr. Majors responded that she could not.

Finally, the ALJ asked whether there were any jobs claimant could perform if she took medications which caused drowsiness or the need to lie down, had almost daily shoulder pain with swelling, was unable to walk or stand for any extended period because of back pain, and was required to stop and lie down every so often during the day because of these problems. In response, Dr. Majors replied that there were not.

### *ALJ's Decision*

As outlined above, upon remand, the ALJ concluded that claimant was not under a disability within the meaning of the Social Security Act from January 31, 2003, through the date last insured which was September 30, 2003. (Tr. 171).

### *Analysis*

I.  **Did the ALJ fail to obtain a proper functional capacity assessment, or to accept the testimony of the claimant and the prior and subsequent reports of her treating orthopedist evidencing claimant's inability to return to work?** *and*

## III.  Is the ALJ's statement of impairments without substantial factual basis?[13]

It is well established that the opinion of a treating physician who is familiar with the claimant's impairments, treatments and responses, should be accorded great weight in determining disability.  *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000); *Leggett v. Chater*, 67 F.3d 558, 566 (5th Cir. 1995); *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994), *cert. denied*, 514 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995).[14]

However, the ALJ is entitled to determine the credibility of the examining physicians and medical experts and to weigh their opinions accordingly.  *Greenspan*, 38 F.3d at 237.   The weight to be given a physician's statement is dependent upon the extent it is supported by specific clinical findings.  *Elzy v. Railroad Retirement Board*, 782 F.2d 1223, 1225 (5th Cir. 1986); *Jones v. Heckler*, 702 F.2d 616, 621 (5th Cir. 1983).  An acceptable medical opinion as to disability must contain more than a mere conclusory statement that the claimant is disabled.  It must be supported by clinical or laboratory findings.  *Oldham v. Schweiker*, 660 F.2d 1078, 1084 (5th Cir. 1981).  The ALJ is required to give substantial weight to the doctors' medical findings, not to their opinions about the actual availability of work for a person.  *Loya v. Heckler*, 707 F.2d 211, 214 (5th Cir. 1983).

---

[13]  Item II is addressed below.

[14]  *See also Smith v. Schweiker*, 646 F.2d 1075, 1081 (5th Cir. 1981) (The testimony of the treating physician must be given substantial weight unless there is good cause shown to the contrary.)

The Fifth Circuit has held that if the ALJ determines that the treating physician's records are inconclusive or otherwise inadequate to receive controlling weight, absent other medical opinion evidence based on personal examination or treatment of the claimant, the ALJ must seek clarification or additional evidence from the treating physician in accordance with 20 C.F.R. § 404.1512(e). *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000). Upon remand of the instant case, claimant submitted additional medical records for the ALJ's review. Specifically, claimant submitted new evidence from Dr. Nason and University Medical Center.

The ALJ accepted the August 8, 2003, opinion of Dr. Nason as a treating source opinion that claimant is unable to perform her past relevant work as a cook helper, meaning that she is unable to perform medium work activity. (Tr. 175). Thus, to the extent that claimant is unable to perform medium work activity, Dr. Nason's opinion was given controlling weight by the ALJ.

However, as to Dr. Nason's statement in his letter dated March 2, 2006, that claimant "is unable to return to any work whatsoever," the ALJ was **not** required to give that statement significant weight in the determination of claimant's disability status as of September 30, 2003. First of all, the statement was, on its face, addressing the status of claimant's condition as of March, 2006; this is too far beyond the claimant's date last insured to be relevant to the determination of the claimant's disability status for purposes of disability insurance benefits. Second, the statement is a legal conclusion rather than a

medical opinion.

Similarly, Dr. Nason's letter of December 6, 2007, stating that claimant "is an excellent candidate for SSI benefits" was correctly given no weight whatsoever by the ALJ in his determination of claimant's disability status. (Tr. 175). First, it is untimely as to the period at issue in the case. Second, Dr. Nason's conclusory statement that claimant is disabled or unable to work is a legal conclusion rather than a medical finding, and, as such, should be accorded very little, if any, weight in the disability determination. *See Frank v. Barnhart*, 326 F.3d 618 (5th Cir. 2003).

As provided in the regulations, the ALJ cannot disregard the treating physician's medical testimony without first evaluating the six factors listed in 20 C.F.R. 404.1527(d).[15] However, in *Frank*, the Fifth Circuit held that when a treating physician offers a conclusory opinion that the claimant is unable to work, the six factors do not apply, because 20 C.F.R. 404.1527(d) is only applicable with respect to *medical opinions* of treating physicians. *Id.* at 620. "Among the opinions by treating physicians that have no special significance are determinations that the applicant is "disabled" or "unable to work." *Id.* The court further held that "[t]hese determinations are legal conclusions that the regulation describes as 'reserved to the Commissioner.'" *Id.*

---

[15] *See Newton v. Apfel,* 209 F.3d 448, 456-58 (5th Cir. 2000) (requiring, in absence of competing first-hand medical evidence, that ALJ consider each of the 404.1527(d) factors in evaluating the medical opinion of a treating physician).

In his decision, the ALJ stated that "the claimant . . . has massive subjective complaints, but the objective clinical evidence simply does not support the degree of limitation alleged by the claimant." (Tr. 176). Claimant's treating physician offers legal conclusions of total disability without any credible medical evidence to buttress his subjective findings. Thus, the undersigned finds that the ALJ's decision to disregard the testimony of Dr. Nason is supported by substantial evidence and is entitled to deference.

As discussed above, the ALJ's RFC assessment is supported by substantial evidence in the record. In order to justify a remand, the evidence must be (1) new, (2) material, and (3) good cause must be shown for the failure to incorporate the evidence into the record in a prior proceeding. *Leggett v. Chater*, 67 F.3d 558, 567 (5th Cir. 1995). The new evidence must pertain to the contested time period and not merely concern a subsequently acquired disability or the deterioration of a condition that was not previously disabling. *Id.*

The ALJ complied with the remand order and obtained new information regarding the claimant's medical condition. (Tr. 254-69). The ALJ utilized a medical expert at the hearing, Dr. Weilepp, who is a board-certified orthopedic surgeon. (Tr. 246). Claimant seeks to discredit Dr. Weilepp's qualifications in her Memorandum by emphasizing that he did not physically examine her and that he has not actively seen patients in seventeen years. (rec. doc. 9). However, claimant had ample opportunity prior to, and at the hearing, to object to Dr. Weilepp's qualifications. Because she chose not to, her right to

do so has been waived.[16]

Dr. Weilepp found that claimant's condition was mild, and he also stated that most of the medical records consisted of claimant's subjective complaints of pain which were not corroborated by any objective, clinical findings of her treating physicians. The ALJ found the opinion of Dr. Weilepp to be consistent with the objective medical evidence in the record. (Tr. 176).

The ALJ also obtained an RFC assessment from a vocational expert at the hearing, Dr. Majors. (Tr. 297-8). Dr. Majors found that claimant was able to perform light work. Although her former job as a cook's assistant or kitchen helper may have been classified as "medium," her previous job of housekeeper is classified as "light." So, while claimant stated that she was unable to do the job of kitchen helper, she has never attempted to go back to work at a "light" job, which the vocational expert testified that claimant is able to do. (Tr. 297-8). There is no objective evidence in the record which refutes the vocational expert's opinion in this regard. On the contrary, claimant testified that she performs many of the tasks associated with the job of housekeeper at her own personal residence.[17]

The ALJ found that claimant's subjective complaints of pain were most likely associated with her bulging disc at L5-S1 and some mild narrowing and increased

---

[16] To the extent that claimant suggests that the opinion of Dr. Weilepp should be afforded little evidentiary weight, that determination is left to the ALJ, not the undersigned.

[17] Claimant testified that she washed dishes, did laundry, cooked, grocery shopped, and did light gardening. (Tr. 290-1).

sclerosis at the lower portion of her right SI joint. (Tr. 174). However, the claimant was not in acute distress at any time and was never a surgical candidate. Dr. Nason released her to return to work in July, 2003. (Tr. 175). Claimant was not issued a TENS unit, nor did she participate in physical therapy. (Tr. 176). The ALJ found that "none of the interventions that would typically be performed in a case of severe back pain have been recommended for this claimant."

The undersigned finds no new factual basis for claimant's allegation that the ALJ did not properly assess claimant's residual functional capacity. Claimant has the burden of proving that she cannot perform her past relevant work as a housekeeper. *Hollis v. Brown,* 837 F2d. 1378, 1386 (5th Cir. 1988). Claimant has failed to do so in this case.

Because the new evidence submitted by claimant does not offer any new relevant medical information and does not pertain to the contested time period, it is not material to this proceeding. The only appropriate action remaining for claimant regarding these facts is to use the evidence as the basis for a new disability application, if timely.

## II. Did the ALJ fail to consider the side effects of the medicines prescribed to claimant?

Under the regulations, the Commissioner is required to consider the "type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate [] pain or other symptoms." *Crowley v. Apfel*, 197 F.3d 194, 199 (5th Cir. 1999) (*citing* 20 C.F.R. § 404.1529(c)(3)(iv)). Claimant argues that she is unable to work on a sustained basis because of pain. However, the undersigned finds that claimant's

testimony regarding the extent and limiting effects of her medication are not entirely credible. The medical records do not provide objective support for her testimony that she needs to nap every day due to the side effects of her prescription medications, and therefore, is unable to work. The medications which have been prescribed to claimant by her treating physicians whose records are in the transcript are not a significant limitation on her ability to work at her previous job as a housekeeper.

The Court notes that during the relevant time period, claimant was prescribed Flexeril at night, Extra-strength Tylenol, Elavil, Bextra, Vioxx, Mobic, and Medrol.[18] (Tr. 98, 115-16, 119, 121-33). These medications were prescribed to her periodically by Drs. Raffai and Nason as needed for pain. (Tr. 116). The ALJ found the medication which claimant has been prescribed are medications indicated for the treatment of mild to moderate pain rather than severe pain. (Tr. 176). The ALJ stated that "this is persuasive evidence that the pain the claimant has experienced, at least through September 30, 2003, is best described as mild to moderate, rather than severe pain which is expected to disable

---

[18] Possible side effects of claimant's medications are as follows: **Flexeril** - Drowsiness, dry mouth, fatigue, dizziness, lightheadedness, constipation, blurred vision, mental/mood changes, and difficulty urinating; **Elavil** - fast heart rate, blurred vision, urinary retention, dry mouth, constipation, weight gain or loss, and low blood pressure. Rash, hives, seizures, and hepatitis are rare side effects **; Bextra -** weakness, chest pain, chills, cysts, edema, fatigue, fever, hot flushes, halitosis, malaise, pain, periorbital swelling, and peripheral pain**; Vioxx** - headache, abdominal pain, dyspepsia, diarrhea, nausea, heartburn, water retention, insomnia, urinary retention, heart failure, aggravation of hypertension, chest pain, ringing in ears, stomach and intestinal ulcers, bleeding, blurred vision, anxiety, weight gain, flu-like symptoms, drowsiness and weakness; **Mobic** - nausea, vomiting, abdominal pain, diarrhea, gas, headache, fatigue related to anemia, joint pain, back pain, insomnia, itching, skin rash, bladder infection and upper respiratory tract infection; **Medrol -** fluid retention, weight gain, high blood pressure, potassium loss, headache, muscle weakness, facial puffiness and hair growth, thinning or easy bruising of skin, glaucoma, cataracts, peptic ulceration, worsening of diabetes, and irregular menses. *www.medicinenet.com.*

the claimant from all work." (Tr. 177).

At the first hearing, on January 21, 2005, claimant testified that she was taking Bextra and Flexeril but no medication for sleeping because she did not want to become dependent on medicine. (Tr. 145, 151). Fontenot's husband indicated at the first hearing that these medications made her "groggy" and "sluggish." (Tr. 156). She stated at that time that she needed to lie down sometimes during the day, but not every day. (Tr. 148).

In March of 2007, claimant presented at an emergency room with complaints of episodic back and neck pain, and she was prescribed Ultram (50 mg) with refills, and also Ambien (10 mg) and Soma (350 mg) with no refills. (Tr. 260, 263).[19] She indicated at that time that she had fibromyalgia, although there is no medical evidence of this diagnosis in the records from her treating physicians. (Tr. 262).

At the second hearing, on February 6, 2008, claimant testified that she had been taking Lortab[20] every day for the previous two months and that it made her tired. (Tr. 281, 289). However, there is no evidence in the record indicating that any of claimant's physicians prescribed Lortab to her at all, much less during the time frame at issue herein. Further, this evidence of prescription medication does not pertain to the time frame in question, and, as such, is not relevant to the issues currently before this Court.

---

[19] Side effects include the following: **Ultram -** nausea, constipation, dizziness, headache, drowsiness, and vomiting. Less commonly reported side effects include itching, sweating, dry mouth, diarrhea, rash, visual disturbances, and vertigo; **Soma-** stomach upset, heartburn, headache, dizziness or drowsiness; **Ambien-** daytime drowsiness, dizziness, lightheadedness, constipation, diarrhea, and dry mouth. *www.medicinenet.com*.

[20] Side effects of **Lortab** include the following: nausea, vomiting, constipation, lightheadedness, dizziness, drowsiness, flushing, vision changes, or mental/mood changes. *www.medicinenet.com*.

Claimant testified that she had to lie down and rest during the day. (Tr. 295). The vocational expert testified that there would be no jobs available to a claimant who was taking medications that occasionally caused drowsiness or the need to lie down, had shoulder pain with swelling on almost a daily basis, was unable to walk for any kind of long distance or stand for an extended period because of back pain, and had to stop and lie down during the day because of these combined factors (Tr. 298-99).

However, none of claimant's treating physicians have indicated exactly what her work-related limitations are with regard to her medications, if any, despite the introduction of new evidence from claimant's treating physicians after the remand in this case. Therefore, the ALJ found these symptoms of claimant to be not credible and inconsistent with the objective medical evidence in the record. (Tr. 177). The undersigned concurs with the ALJ in this regard.

The ALJ is only required to rely on the vocational expert's testimony in response to the hypothetical that includes the limitations *recognized by the ALJ* as being claimant's residual functional capacity. *Bowling v. Shalala*, 36 F.3d 431 (5th Cir. 1994). In this case, the ALJ implicitly considered and rejected claimant's testimony regarding the extent of the side effects described by her because he found her testimony was not credible and he found that the medicines prescribed to claimant were medications for mild to moderate pain rather than severe pain. The ALJ's decision in this regard is supported by substantial evidence in the record.

The court's function is to determine whether substantial evidence supports the ALJ's decision. As set forth above, a finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the decision. *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir.1988). Here, the medical evidence, considering claimant's symptoms, support the ALJ's finding that she retained the residual functional capacity to perform a limited range of light work. Further, the testimony of the vocational expert supports the ALJ's determination that claimant can perform light work and is not disabled. Thus, the undersigned finds that substantial evidence in the record supports the ALJ's decision. Accordingly, it is **RECOMMENDED** that the Commissioner's decision be **AFFIRMED** and the case be **DISMISSED**.

Under the provisions of 28 U.S.C. Section 636(b)(1)(c) and Rule 72(b), parties aggrieved by this recommendation have ten (10) business days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within ten (10) days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within ten (10) days following the date of receipt, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal

conclusions accepted by the District Court, except upon grounds of plain error. *See*

*Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).

Signed at Lafayette, Louisiana, on August 3, 2009.

C. Michael Hill

C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE